**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 12-2157**

GERARDO GRANADOS AYALA,

             Plaintiff – Appellant,

        v.

J. W. WOLFE, II; LEXINGTON POLICE DEPARTMENT,

             Defendants – Appellees.

Appeal from the United States District Court for the Middle
District of North Carolina, at Greensboro.  Catherine C. Eagles,
District Judge.  (1:11-cv-00624-CCE-LPA)

Argued:  September 18, 2013        Decided:  November 13, 2013

Before DAVIS, WYNN, and DIAZ, Circuit Judges.

Affirmed by unpublished opinion.  Judge Wynn wrote the opinion,
in which Judge Davis and Judge Diaz joined.

Eugene Ernest Lester, III, SHARPLESS & STAVOLA, PA, Greensboro,
North Carolina, for Appellant.   Jack M. Strauch, STRAUCH
FITZGERALD & GREEN, PC, Winston-Salem, North Carolina, for
Appellees.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

In the dark of night near the scene of an armed robbery, Plaintiff Gerardo Granados Ayala disregarded a police officer's command to place his hands on the hood of a patrol car. Instead, without saying a word, Ayala took one hand from the hood, reached into the waistband of his pants, and removed a gun. In response, the officer, Defendant J.W. Wolfe, II, shot Ayala. Under the circumstances of this case, the district court did not err in ruling that Wolfe's application of deadly force was not excessive, and that Ayala's Section 1983 and related claims must fail. Accordingly, we affirm the grant of summary judgment in Defendants' favor.

I.

In July 2010, at 1:45 a.m., Wolfe, an officer with the Lexington, North Carolina Police Department, responded to a report that three armed men had robbed a restaurant. The report indicated that the men fled on foot. Wolfe canvassed the area near the restaurant and saw Ayala walking just a few blocks away. Wolfe stopped his patrol car and instructed Ayala to put his hands on the hood of the patrol car. After Ayala complied with the order, Wolfe frisked him. Upon feeling a gun in Ayala's waistband, Wolfe backed away from Ayala, moved behind his patrol car, and drew his service weapon. Without saying a

2

word to the officer, Ayala moved his right hand from the patrol car to his waistband and removed the gun.

In response, Wolfe shot Ayala several times. The first bullet hit Ayala's right hand and knocked the gun to the ground.[1] Wolfe nevertheless continued to shoot Ayala in the torso until he fell. Ayala lost consciousness after hitting the ground and does not remember any shots after he fell. But despite being unconscious, Ayala "believe[s]" that Wolfe shot him in his back while he lay on the ground and that that bullet paralyzed him from the waist down. J.A. 204.

The scene of the shooting was, in Ayala's words, "very dark[.]" J.A. 77. Wolfe declared that the "very bright" flash from his gun after he shot "further hindered" his ability to see. J.A. 73. Wolfe did not know that Ayala dropped his gun after the first shot, but stated that he immediately stopped shooting once Ayala fell to the ground. Ayala testified that he had no idea what Wolfe could (or could not) see after the first shot, that he did not know whether his gun made a sound when it fell to the ground, and that he did not tell Wolfe—or otherwise

---

[1] In reviewing the district court's summary judgment ruling, "courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." Scott v. Harris, 550 U.S. 372, 378 (2007) (alteration in original) (internal quotation marks omitted). In qualified immunity cases, this requirement "usually means adopting . . . the plaintiff's version of the facts." Id.

3

indicate to Wolfe—that he no longer held the gun. Two witnesses declared that they heard a series of gunshots in the middle of the night, a pause of four or five seconds, and then an additional gunshot. In Ayala's words, the time between Wolfe's shots was "really fast." J.A. 88–89.

In August 2011, Ayala filed this lawsuit against Wolfe in his individual capacity and against the Lexington Police Department, alleging Section 1983 claims and several state law claims.[2] After the close of discovery and upon learning that Defendants intended to move for summary judgment, Ayala moved to amend his complaint.

The district court granted the summary judgment motion, determining that the evidence was insufficient to show that Wolfe used excessive force in shooting Ayala. In addition, the district court denied Ayala's motion to amend the complaint. Ayala appealed.

## II.

With his first argument, Ayala contends that the district court erred by granting summary judgment to Defendants on his Section 1983 claims because Wolfe used unconstitutionally

---

[2] On appeal, Ayala does "not persist in his allegation that [the Lexington Police Department] committed a Monell [policy and custom] violation as alleged in Count II of his original Complaint." Appellant's Br. at 20 n.1.

4

excessive force by (1) initially shooting Ayala; (2) continuing to shoot Ayala after he dropped his gun; and (3) shooting Ayala after he fell to the ground.[3]  We review de novo the district court's grant of summary judgment, viewing all facts and drawing reasonable inferences in Ayala's favor.  See Henry v. Purnell, 652 F.3d 524, 531 (4th Cir.) (en banc), cert. denied, 132 S. Ct. 781 (2011).  Summary judgment is appropriate only if "'no material facts are disputed and the moving party is entitled to judgment as a matter of law.'"  Id. (quoting Ausherman v. Bank of Am. Corp., 352 F.3d 896, 899 (4th Cir. 2003)).

A.

"The Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of 'seizures effectuated by excessive force.'"  Id. (quoting Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006)).  Courts analyze whether an officer has used excessive force under a standard of objective reasonableness.  Id.  The reasonableness of a particular use of force must be judged from the perspective of a reasonable

---

[3] Ayala also argues that the district court erred by not addressing his allegation that Wolfe violated his Fourth Amendment rights by unlawfully stopping him.  However, Ayala did not raise this claim until his rejected motion to amend.  Thus, this claim is not properly before us.

officer on the scene rather than with 20/20 hindsight. <u>Anderson v. Russell</u>, 247 F.3d 125, 129 (4th Cir. 2001).

"The intrusiveness of a seizure by means of deadly force is unmatched." <u>Tennessee v. Garner</u>, 471 U.S. 1, 9 (1985). Therefore, a police officer may use deadly force only when he has "probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" <u>Id.</u> at 11. When a suspect confronts an officer with a weapon, we have deemed the officer's use of deadly force reasonable. <u>See Elliott v. Leavitt</u>, 99 F.3d 640, 642-43 (4th Cir. 1996) (holding that police officers' actions were objectively reasonable when they shot a man who pointed a handgun at them after they had arrested him). As we have stated, "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." <u>Id.</u> at 644.

B.

With this legal framework in mind, we turn to Ayala's arguments in this case. Ayala first contends that Wolfe's initial decision to shoot him constituted excessive force. In particular, Ayala claims that he never threatened Wolfe or pointed his gun at Wolfe before Wolfe shot him. But even with the benefit of every reasonable inference, a reasonable officer would have had probable cause to fear serious physical harm

6

justifying the use of deadly force under the circumstances of this case.

Crucially, Wolfe instructed Ayala to place both hands on the hood of the patrol car. Ayala testified that he understood Wolfe's command. Yet without saying a word to explain his actions, Ayala took his right hand off the hood to remove the gun in his waistband. On these facts, Wolfe acted objectively reasonably in concluding that Ayala posed a threat of serious physical harm warranting the use of deadly force at the time of the first shot. Cf. Elliott, 99 F.3d at 642-44 (finding officers' use of deadly force against a handcuffed suspect sitting in a patrol car reasonable because the suspect managed to point a gun at them).

C.

The initial decision to shoot aside, Ayala argues that because he dropped his gun after the first shot, Wolfe used excessive force by continuing to fire at him. Ayala relies heavily on Waterman v. Batton, 393 F.3d 471 (4th Cir. 2005), which held that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated." Id. at 481. The problem for Ayala is that "the reasonableness of an officer's actions is determined based on the information

7

possessed by the officer at the moment that force is employed." Id. (citing Elliott, 99 F.3d at 643). And Ayala has proffered no evidence that Wolfe should have known that he had dropped his gun after the first shot, i.e., that the justification for using deadly force had been "eliminated" after the first shot. See id.

Ayala testified that he had no idea what Wolfe could see after firing the first shot but confirmed that it was "very dark[.]" J.A. 77. Ayala further testified that he did not know whether his gun made a sound when it fell to the ground, and he never informed Wolfe that he no longer held the gun. Additionally, Ayala testified that the time between the first shot and the "other ones" was really fast, J.A. 89, and that he did not fall down until after the fifth shot. J.A. 92.

Wolfe testified that he could not see whether Ayala had dropped his gun because of the darkness and the muzzle flash from his gun. Instead, he focused on the center of Ayala's body when he fired his weapon, and he "never heard any sound that would have suggested that Mr. Ayala had dropped his gun." J.A. 74.

In essence, Ayala proffered no evidence that a reasonable officer under the circumstances could have known that the threat justifying the use of deadly force—that is, Ayala's grabbing his gun from his waistband in contravention of Wolfe's order to

8

place his hands on the hood of the patrol car—had been eliminated after the first shot, even assuming (as we must on summary judgment) that it was. Cf. Estate of Rodgers ex rel. Rodgers v. Smith, 188 F. App'x 175, 183 (4th Cir. 2006) (unpublished decision) (concluding that even though the suspect dropped his firearm as he fell, the police officer acted reasonably in continuing to shoot because nothing in the record reflected that the officer knew that the suspect was no longer a threat).

D.

Ayala also challenges the district court's determination that Wolfe did not use excessive force by firing the final shot. Ayala contends that Wolfe shot him in the back while he lay on the ground on his stomach and four to five seconds after the previous shots. Again, Ayala has failed to point to any record evidence to support this contention.

Ayala admits that he was unconscious after he hit the ground and thus could not competently testify that he was shot after he fell.

Nor could Ayala's experts testify that Wolfe fired the final, paralyzing shot after Ayala had fallen to the ground. One expert testified that he could not determine "whether [Ayala] was lying down, whether he was standing, or . . . what

9

position the shooter was [in]" when Wolfe fired the final shot. J.A. 153. The other expert testified that "[Ayala] could have sustained that shot that rendered him paraplegic in a standing position, as he was going down, or after he was on the ground. . . . [A]ny one of these [is] possible . . . ." J.A. 297.

Ayala relies on two witnesses who testified that they heard gunshots and, after a pause of four or five seconds, an additional shot. But these witnesses did not see the shooting or provide any information beyond the pause before the last shot. Their testimony thus has little bearing on the question of whether Wolfe fired the final shot after Ayala fell to the ground or after Wolfe could have reasonably determined that Ayala was no longer a threat.

Wolfe stated that "[a]t no time did I ever shoot at Mr. Ayala after he fell to the ground or otherwise use any type of force against Mr. Ayala after he fell to the ground." J.A. 74. Ayala has failed to proffer any evidence to controvert Wolfe's testimony. And the district court properly rejected Ayala's unsupported speculation about what happened after he had fallen.

In sum, Ayala has pointed to no evidence that Wolfe used excessive force at the time of the first shot, upon firing additional shots, or at the time of the last shot. The district court therefore properly granted summary judgment to the Defendants on Ayala's Section 1983 claims.

10

III.

Ayala also asserted several state law claims against Wolfe, including battery, negligence, gross negligence and intentional infliction of emotional distress. In North Carolina, a public officer is entitled to immunity "unless it is alleged and proved that his act, or failure to act, was corrupt or malicious, or that he acted outside of and beyond the scope of his duties." Showalter v. N.C. Dep't of Crime Control & Pub. Safety, 183 N.C. App. 132, 136, 643 S.E.2d 649, 652 (2007); see also Turner v. City of Greenville, 197 N.C. App. 562, 566, 677 S.E.2d 480, 483 (2009) (stating that the public immunity doctrine protects a public official from individual liability for negligence as long as the official "lawfully exercises the judgment and discretion with which he is invested by virtue of his office, keeps within the scope of his official authority, and acts without malice or corruption" (quoting Bailey v. State, 330 N.C. 227, 245, 412 S.E.2d 295, 306 (1991))).

Ayala contends that the district court erred by granting Defendants' motion for summary judgment on his state law claims arising from Wolfe's actions. Here, Ayala has not overcome Wolfe's public officer immunity under North Carolina state law. As explained above, the record evidence necessarily leads to the conclusion that Wolfe's actions were objectively reasonable under the circumstances. Thus, Ayala has not shown that Wolfe

11

acted corruptly, maliciously, or outside the scope of his duties.

IV.

With his last argument on appeal, Ayala contends that the district court abused its discretion by denying his motion to amend his complaint. While we review such a decision only for abuse of discretion, "'leave to amend a pleading should be denied *only when* the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile.'" Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 409 (4th Cir. 2013) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 242 (4th Cir. 1999)).

Ayala initially sought to amend his complaint to add: (1) a claim that the initial stop violated the Fourth Amendment and constituted false imprisonment, and (2) state law claims against the Lexington Police Department in its official capacity alleging waiver of sovereign immunity based on an insurance policy. Ayala later sought to add the City of Lexington as an additional defendant. The district court did not abuse its discretion in barring Ayala from belatedly asserting new claims and adding a new party. Much time had passed, discovery had concluded, and granting Ayala's late motion would prejudice

12

Defendants. See Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 379-80 (4th Cir. 2012) (affirming the district court's denial of the appellants' motion to amend the complaint to add new allegations and causes of action after a significant amount of discovery had been conducted because of the resulting prejudice to the appellees). Further, the district court did not abuse its discretion in determining that the proposed state law claims against the Lexington Police Department would be futile, given the lack of evidence supporting Ayala's excessive force claim.

V.

In sum, the district court properly concluded that Wolfe did not use excessive force when he shot Ayala. We reiterate our admonition that "[n]o citizen can fairly expect to draw a gun on police without risking tragic consequences." Elliott, 99 F.3d at 644. Yet, this case surely begs the questions of why the officer did not remove Ayala's gun when he discovered it during his frisk or communicate to Ayala after discovering the gun. Perhaps those simple steps could have obviated the (objectively reasonably perceived) need to fire even one shot at Ayala. However, this case turns not on what could have been, but on the objective reasonableness of the force applied under the circumstances as they played out. And under the facts of

13

this case, Wolfe's use of deadly force was objectively reasonable.  Accordingly, the district court's decision is

AFFIRMED.